Submitted October 31, 2011, reversed and remanded December 5, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LEONARDO ESPINOZA-BARRAGAN,
aka Leonardo Espinoza-Barragan,
*Defendant-Appellant.*

Marion County Circuit Court
09C48092; A145161

293 P3d 1072

Peter Gartlan, Chief Defender, and Eric Johansen, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Douglas F. Zier, Senior Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

In this criminal case, defendant appeals the trial court's judgment convicting and sentencing him for one count of delivery of methamphetamine, ORS 475.890.[1] On appeal, defendant challenges the trial court's denial of his motion to suppress evidence that, he argues, derived from a violation of his rights under Article I, section 9, of the Oregon Constitution.[2] As in the trial court, defendant argues that (1) he was unlawfully detained when a police officer, who had stopped him for a traffic violation, extended the stop by initiating a drug investigation without reasonable suspicion to do so, and (2) the evidence resulting from the illegal detention was inadmissible. We agree and, therefore, reverse and remand.

We begin with the facts, which we state consistently with the trial court's findings. Around 2:00 a.m. on September 11, 2009, Deputy Landers of the Marion County Sheriff's Department was driving a marked patrol car southbound on I-5 in Salem, near the Portland Road exit. He noticed a Dodge Durango with Washington plates. The Durango, which defendant was driving, was in the center lane and was traveling at approximately 60 miles per hour. Landers, who was in the left lane, passed the Durango. As he did, he noticed that defendant kept his head and eyes facing forward. Because defendant did not make eye contact with him, Landers decided to follow the Durango. He slowed down and allowed the Durango to get ahead of him. While Landers was following it, the Durango slowed to approximately 50 miles per hour. It drifted to the right and touched the white lane markers, which Landers considered to be a traffic violation. The Durango traveled below the speed limit for a few miles before taking the next exit from I-5, at Market Street. At the bottom of the exit ramp, the Durango stopped at a traffic signal and turned left onto Market Street. Landers observed the Durango change lanes on Market Street without having signaled for 100 feet, a second traffic violation. Landers initiated a traffic stop.

---

[1] ORS 475.890 provides, in part, "Except as authorized by ORS 475.005 to 475.285 and 475.752 to 475.980, it is unlawful for any person to deliver methamphetamine."

[2] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

Landers approached the Durango, introduced himself to defendant, told defendant why he had stopped him, and asked defendant for his license, registration, and proof of insurance. Defendant's primary language is Spanish, but, according to Landers, defendant was able to understand his questions and he understood defendant's answers.

The Durango is a large vehicle, with three rows of seats. Defendant had two passengers: a male sleeping in the front passenger seat and another male lying across the middle row of seats. While defendant was gathering the paperwork that Landers had requested, Landers asked him where he was going. Defendant answered, "Denny's." Landers asked where defendant had come from, and defendant answered "Tacoma." Given that answer, Landers tried to clarify where defendant was going and asked defendant for his "final destination." Defendant again answered, "Denny's." When Landers asked defendant why he would drive from Tacoma to go to the Denny's in Salem, defendant answered that he was traveling to San Jose to pick up his wife and son and had stopped to get something to eat and rest. Landers asked how long defendant planned to stay in San Jose, and defendant held up two fingers and said two days.

While defendant continued to look for the requested paperwork, Landers obtained identification information from the two passengers. Defendant gave Landers his license, but explained that he did not have registration or insurance information for the Durango because he had bought it a few days earlier. Defendant gave the vehicle sale paperwork to Landers. Landers returned to his patrol car; on his way, he looked inside the Durango and did not see any luggage.

While back at his patrol car, Landers examined the vehicle sale paperwork, which indicated that defendant had purchased the Durango on September 5, six days earlier. As Landers later recalled at the hearing on defendant's motion to suppress, the total sale price was "roughly $4,200," defendant had paid $3,700 cash, and he owed "roughly $506."

Also while back at his patrol car, Landers checked the status of defendant and his two passengers. He learned that there were no warrants for defendant or his passengers.

Landers suspected that defendant and his passengers were involved in drug trafficking, and he called for a second officer to come to the scene. Officer Hickam arrived within five minutes.

Landers returned to the Durango and asked defendant to step out of the Durango, which defendant did. Landers continued to question defendant about his trip. Eventually, Landers asked defendant if he had anything illegal with him, such as drugs or weapons, and defendant answered that he did not. Landers obtained defendant's consent to search defendant and the Durango. In the Durango, Landers found a backpack behind the driver's seat and a zippered bag on the third row seat. He searched the backpack and zippered bag and found methamphetamine and large amounts of cash. Landers arrested defendant and his two passengers, and they were charged with delivery of methamphetamine.

Defendant filed a motion to suppress the evidence discovered after Landers asked him to step out of the Durango. Defendant argued that, although Landers had lawfully stopped him for the two traffic violations, Landers extended the duration of the traffic stop by initiating a drug investigation and that extension violated Article I, section 9, because it was not supported by reasonable suspicion.[3] Defendant further argued that all evidence obtained as a result of the extension—including the evidence discovered during the searches of his person and vehicle—was inadmissible.

At the hearing on defendant's motion to suppress, Landers testified that he had received training about "indicators" that a person is involved in drug trafficking. Specifically, he testified that he had taken three courses about indicators of drug trafficking on I-5. According to Landers, "unusual behaviors" can be indicators of drug trafficking.

---

[3] In his motion to suppress, defendant also relied on the Fourth Amendment to the United States Constitution, but he does not rely on the Fourth Amendment on appeal.

Landers testified that defendant's behavior was unusual and gave rise to reasonable suspicion of drug trafficking because defendant (1) did not make eye contact, (2) slowed down and took the next exit off the highway, (3) twice said that he was going to Denny's before clarifying that he was stopping at Denny's while en route to San Jose, (4) held up two fingers when he said he was going to be in San Jose for two days, (5) did not appear to have any luggage, and (6) was driving a car that he had recently purchased with cash, for which he did not have registration or insurance information.

The trial court concluded that Landers extended the traffic stop when he asked defendant to step out of the Durango. The court further concluded that the extension did not violate Article I, section 9, because, according to the court, "taken in totality, *** the relevant facts known to Landers at [that time] did give rise to a reasonable suspicion of criminal activity ***."

On appeal, the issue is whether Landers's extension of the traffic stop into a criminal investigation for drug trafficking was supported by reasonable suspicion that defendant was engaged in criminal activity. An officer has reasonable suspicion that a person has committed or is about to commit a crime if the officer "holds a belief that is reasonable under the totality of the circumstances existing at the time and place" the officer acts. ORS 131.605; *see also State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997). Reasonable suspicion has two components: the officer must subjectively believe that the person is engaged in criminal activity, and that belief must be objectively reasonable. *Belt*, 325 Or at 11. To be objectively reasonable, an officer's suspicion must be based on specific and articulable facts. *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993); *State v. Mitchele*, 240 Or App 86, 91, 251 P3d 760 (2010).

Both we and the Supreme Court have held, in cases involving traffic stops similar to the one in this case, that the officer conducting the stop did not have objectively reasonable suspicion to extend the duration of the stop in order to inquire about drug trafficking. Two cases are illustrative: *State v. Dominguez-Martinez*, 321 Or 206, 214,

895 P2d 306 (1995), and *State v. Juarez-Godinez*, 135 Or App 591, 900 P2d 1044 (1995), *aff'd on other grounds*, 326 Or 1, 942 P2d 772 (1997).

In *Juarez-Godinez*, an officer stopped the defendant for a traffic violation and extended the traffic stop to conduct a drug investigation. The defendant, who was Hispanic, was traveling on I-5 with two passengers, who were also Hispanic. They told the officer that they were headed home to Tacoma from Eugene, where they had been visiting a relative. The officer believed that the defendant and his passengers were engaged in drug trafficking. He explained the reasons for his belief as follows:

> "From my training and experience, I noticed several characteristics displayed by the occupants of the vehicle that I know are often the same characteristics displayed by known narcotics traffickers. I noticed a heavy odor of air freshener in the vehicle. I did not see any luggage in the vehicle. I noticed that all occupants were wearing newly purchased clothing. The driver was wearing a gold necklace, a gold ring, and had salon-styled hair. A third-party [vehicle] registration is also very common with narcotics traffickers. I also know through my training and experience that Tacoma, Washington, [defendant's stated destination] is a frequent destination of narcotics traffickers."

*Id.* at 606 (bracketed material in original; internal quotation marks omitted). The officer added that the registered owner of the car was on probation for delivery of a controlled substance, one of the two passengers had an unconfirmed drug offense, and the defendant had become nervous when the officer asked him to consent to a search of the car. *Id.* at 607. According to the officer, the defendant became "'visibly nervous, turn[ed] pale, agitated, [was] perspiring, and exhibited furtive eye movements.'" *Id.*

Relying on *State v. Valdez*, 277 Or 621, 561 P2d 1006 (1977), in which, we explained, the Supreme Court "accorded no weight to the investigating officer's observations of 'shined shoes, sharp clothes, neat "Afro" haircuts, and people who stand and stare at officers,'" we held that the officer did not have reasonable suspicion to investigate the defendant and his passengers for drug trafficking. *Juarez-Godinez*, 135 Or App at 607 (quoting *Valdez*, 277 Or at 628). We explained:

"[A] clean-smelling car containing three well-dressed occupants en route to Tacoma does not provide an objectively reasonable basis, whether by itself or added to the other factors, to suspect that the vehicle contained contraband. The lack of visible luggage also adds nothing, because, with three adults riding in the vehicle, any luggage would likely have been placed in the trunk. Finally, there is no objective quality to any of [the officer's] other observations that would entitle them to any weight. The registered owner of the vehicle was not even at the scene, and the alleged drug 'record' of the passenger was unspecified and unconfirmed."

135 Or App at 607. *See also Juarez-Godinez*, 326 Or at 9 (characterizing the officer's factual observations as "unremarkable").

Similarly, in *Dominguez-Martinez*, the Supreme Court held that an officer did not have objectively reasonable suspicion to extend a traffic stop in order to conduct a drug investigation. 321 Or at 213 n 6. In *Dominguez-Martinez*, the defendant and his passenger were traveling on I-5 and, according to the officer, they exhibited characteristics associated with drug trafficking, specifically, "the type of vehicle; California plates; travel from California to Washington; young, Hispanic, male occupants; and minimal clothing and luggage." *Id.* at 208 n 1. The Supreme Court held that those "noncriminal characteristics" did not give rise to reasonable suspicion that the defendant and his passenger were engaged in criminal activity. *Id.* at 213 n 6.

The facts of this case do not differ in any material way from those in *Juarez-Godinez* and *Dominguez-Martinez*. As in those cases, we conclude that the factors on which Landers relied to extend the duration of his stop of defendant did not give rise to reasonable suspicion.

As mentioned, Landers believed that defendant's behavior was unusual and gave rise to reasonable suspicion of drug trafficking because defendant (1) did not make eye contact, (2) slowed down and took the next exit off the highway, (3) twice said that he was going to Denny's before clarifying that he was stopping at Denny's while en route to San Jose, (4) held up two fingers when he said he was going to be in San Jose for two days, (5) did not appear to have

any luggage, and (6) was driving a car that he had recently purchased with cash, for which he did not have registration or insurance information.

As we understand Landers's testimony, the first four indicators caused him to believe that defendant was nervous and evasive. Thus, Landers's reasons for believing that defendant was engaged in drug trafficking reduce to three: (1) defendant was nervous and evasive, (2) he did not appear to have any luggage, and (3) he was driving a car that he had recently purchased with cash, for which he did not have registration or insurance information.

As to the first factor, nervousness during a traffic stop contributes little, if any, weight toward reasonable suspicion that the driver is engaged in criminal activity. As we held in *State v. Berry*, 232 Or App 612, 618, 222 P3d 758 (2009), *rev dismissed*, 348 Or 1 (2010), "there is nothing inherently suspicious about * * * being nervous when pulled over by a police officer, particularly at [a very early morning] hour." *See also State v. Rutledge*, 243 Or App 603, 610, 260 P3d 532 (2011) (facts that the defendant had just left a motel that had a reputation as a location of illegal drug activity, was a passenger in a car with a person suspected of drug activity, and acted nervously when asked about her purse did not give rise to reasonable suspicion of possession of drugs); *Juarez-Godinez*, 135 Or App at 607 (the defendant's nervous reaction to officer's questioning did not, alone or in combination with other factors, give rise to reasonable suspicion of drug trafficking).

The same is true of a person's legal efforts to avoid being stopped by or questioned by the police. On this point, *State v. Frias*, 229 Or App 60, 210 P3d 914 (2009), is instructive. In *Frias*, an officer stopped the defendant for a traffic violation and asked the defendant where he had been. *Id.* at 62. The defendant explained that he had been with a friend, but, according to the officer, the defendant became "evasive" when questioned why he had been visiting his friend and "hemmed and hawed" before finally answering. *Id.* We concluded that the "defendant's evasive reaction to questioning that he [was] constitutionally entitled to refuse to answer" did not, combined with knowledge of

the defendant's previous drug use, provide reasonable suspicion of current drug use. *Id.* at 65-66. "It was not objectively reasonable to suspect present criminal drug activity solely because [the] defendant ha[d] been involved in drugs in the past and did not want to fully answer police questions." *Id.* at 66. Likewise, in *Berry*, we held that the defendant's transparently false explanation for turning into a particular parking lot, in combination with the defendant's nervousness, furtive movements, and prior presence at a known location for drug trafficking did not give rise to reasonable suspicion that the defendant possessed drugs. 232 Or App at 617-18. *See also State v. Kentopp*, 251 Or App 527, 532, 284 P3d 564 (2012) (the defendant's "(1) furtive movements; (2) nervous demeanor; (3) gray, rotting teeth; (4) conduct consistent with trying to flee the scene; (5) failure to have registration and proof of insurance for the car that he was driving; and (6) statement that he was borrowing the car from another person" were insufficient to give rise to a reasonable suspicion that the defendant possessed drugs).

In this case, defendant did not make eye contact as Landers passed him. In other words, defendant kept his eyes forward as he was driving down an interstate highway at 2:00 a.m. There is simply nothing suspicious about that; it is a completely neutral fact. It contributes nothing toward a reasonable suspicion of criminal activity.

After Landers dropped back behind defendant, defendant slowed down. Defendant then took the next exit, which led to a Denny's. After Landers stopped defendant and asked where he was going, defendant provided a direct answer: Denny's. In response to further questioning, he repeated that answer, before clarifying that he was stopping at Denny's to eat and rest before continuing on to San Jose. When asked how long he would be in San Jose, defendant said two days and held up two fingers.

Even assuming that defendant slowed down and took the exit because he wanted to avoid contact with Landers and that defendant was intentionally withholding information from Landers, those facts contribute little, if anything, toward a reasonable suspicion of criminal activity. They are not materially different from the defendant's

evasiveness in *Frias* or the defendant's transparently false explanation in *Berry*. They may support an inference that defendant did not want to engage with the officer or share information with him, but, of course, defendant was not required to do so. Moreover, as we have held, such an inference does not give rise to reasonable suspicion of criminal activity, even when combined with other facts such as prior drug use, *Frias*, presence at a location known for drug activity, *Berry*, or driving another person's car without proof of registration or insurance, *Kentopp*.

As to the second factor upon which Landers relied—the absence of any visible luggage—we conclude that that factor adds nothing to the reasonable suspicion calculus. When Landers walked back to his patrol car he did not see any luggage in the Durango, but that fact is not entitled to any weight, given the limited nature of Landers's examination of the Durango. An officer cannot conclude that a driver is not carrying any luggage if the officer does not, or cannot, look into places in the driver's vehicle that are likely to hold luggage. *Juarez-Godinez*, 135 Or App at 607. The Durango is a large vehicle, with three rows of seats. Landers either did not, or could not, look into it in a manner sufficient to allow him to conclude that defendant was not carrying luggage. As Landers later discovered, there were bags inside the Durango: a backpack behind the driver's seat and a zippered bag on the third row seat. Although Landers did not know that there were bags in the Durango when he extended the traffic stop, he did know the extent to which he had looked into the Durango and, therefore, he knew he did not have a sufficient basis for concluding that defendant was not carrying any luggage.

Furthermore, even if defendant was not carrying luggage, that fact is one that we and the Supreme Court have considered, in combination with other facts, in similar cases and concluded that the officer did not have reasonable suspicion of drug activity. *Dominguez-Martinez*, 321 Or at 213 n 6; *Juarez-Godinez*, 135 Or App at 607.

As to the third factor—that defendant was driving a vehicle that he had recently purchased with cash and for which he did not have proof of registration or insurance—

we conclude that the factor also contributes little toward a conclusion that defendant was engaged in criminal activity. It is akin to the fact in *Juarez-Godinez* that the defendant was driving a car registered to a third party, a fact that was not sufficient, on its own or in combination with other facts that the officer believed were suspicious, to justify an extension of the traffic stop in that case.

Of course, the factors must be considered together. However, because the luggage factor is entitled to no weight, we are left with the facts that (1) defendant was nervous and his actions could be seen as reflecting a desire to avoid police contact and questioning and (2) he was driving a used car that he had recently bought for cash and for which he did not have registration or insurance information. As in similar cases, we conclude that those facts are not sufficient to give rise to reasonable suspicion of criminal activity. Therefore, Landers's extension of the traffic stop violated Article I, section 9.

Because the extension violated Article I, section 9, and there is no dispute that evidence defendant sought to suppress was discovered as a result of that extension, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.