Argued and submitted April 30, 2012, reversed and remanded January 16, 2013

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# JOSE MACIEL,
aka Fabian Villalabos-Cantu,
*Defendant-Appellant.*

### Jackson County Circuit Court
092084AFE; A145086

295 P3d 145

Lindsey K. Detweiler, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, arguing that the trial court erred in denying his motion to suppress drug-related evidence obtained during an unlawful stop. We review for legal error whether a police officer's interaction with an individual amounts to an unlawful seizure under Article I, section 9, of the Oregon Constitution. *State v. Smith*, 252 Or App 518, 519, 287 P3d 1210 (2012). We conclude that the drug-related evidence should have been suppressed and, accordingly, reverse and remand.

The relevant facts are undisputed. Early one morning, Troopers Walport and Hillier of the Oregon State Police were monitoring northbound traffic on I-5, just north of the California border. At approximately 4:00 a.m., Hillier, who was operating a lidar speed gun,[1] observed a vehicle traveling 60 miles per hour in a 55-mile-per-hour zone. Walport pulled out behind the vehicle and activated his overhead lights. The vehicle slowed to approximately 20 miles per hour, moved over, and straddled the fog line; it did not come to a stop. Walport watched the driver lean over and slap someone in the passenger seat, who quickly sat up. The occupants appeared to be talking amongst themselves.

Approximately one half mile after Walport had activated his overhead lights, the driver stopped the vehicle on the highway shoulder. Walport approached the passenger side of the vehicle and told the driver that he had been stopped for a speeding violation. Walport asked the driver if he spoke any English, and the driver replied, "No." During that exchange, Walport noticed that the passenger—defendant—appeared angry; he had crossed arms and a clenched jaw, and he was shaking his head while staring directly ahead.

---

[1] The term "lidar" is derived from the phrase "light detection and ranging" and describes a device that "shoots" a series of laser pulses at a target and then measures the light reflected back to the device to determine the distance to, and ultimately the speed of, the target object. *See generally State v. Branch*, 243 Or App 309, 314-15, 259 P3d 103, *rev den*, 351 Or 216 (2011).

Walport asked the driver for his license, insurance, and registration. The driver provided an Oregon driver's license while defendant opened the glove compartment and retrieved the vehicle's registration and insurance information, which did not match the name on the driver's license. Walport first asked the driver and then defendant if either of them owned the vehicle, and each responded, "No."

Walport then asked who owned the vehicle, and defendant offered a series of inconsistent answers. Defendant first explained that the vehicle belonged to a friend, but, when Walport asked for the friend's name, defendant vacillated and instead explained that the vehicle belonged to a friend of a friend. Walport asked for the friend-of-a-friend's name. Defendant paused, apparently in thought, and eventually answered "Monzo"—the name on the registration. Walport asked defendant why they were driving Monzo's vehicle, and defendant explained that he had purchased the vehicle in California, although he could not provide any documentation for the sale.

The interior of the car did not appear to Walport to be consistent with the interior of a vehicle that had just been purchased, because it had food wrappers and receipts scattered around it and a child's car seat that appeared to have been in place for some time. Several other items—or the lack thereof—in the vehicle also attracted Walport's attention: Both the driver and the passenger had identical prepaid cellular phones, there was no visible luggage in the passenger compartment of the vehicle,[2] and there was a religious medallion affixed to the vehicle's rearview mirror.

Walport asked defendant for identification, and defendant produced an Oregon driver's license. At 4:18 a.m., Walport returned to his patrol car and requested a warrant check on defendant and the driver. While that check was pending, Walport returned to the passenger side of defendant's vehicle and asked defendant to accompany him to the patrol car so that defendant could clarify the details of his purported purchase of the vehicle. Defendant complied and explained that he and the driver had traveled

---

[2] Defendant later told Walport that defendant and the driver each had a bag in the trunk of the vehicle.

from Woodburn, Oregon, to Oakland, California, in their own vehicle to visit their friend, Junior. While in Oakland, defendant decided that he wanted to purchase the vehicle in which they had been stopped. Junior took defendant to a street corner in Oakland, where defendant met Monzo and purchased the vehicle.

Walport asked defendant how much he had paid for the vehicle. Defendant explained that he had not yet paid for the vehicle, but, instead, he was conducting a test drive of it from Oakland to Woodburn, a distance of approximately 600 miles. In a series of follow-up questions, Walport learned that defendant and Monzo had not settled on a purchase price, that defendant did not have Monzo's phone number, and that defendant had no way of transferring money to Monzo to complete the sale. Asked about those gaps in his plans, defendant explained that he would contact Junior, who would then contact Monzo and figure out the remaining details. In the event that defendant was dissatisfied with the car as a result of his test drive, he did not know how he was going to return the vehicle nor how he would reclaim the vehicle that he had left in Oakland. Over the course of the conversation, defendant noticeably relaxed, appearing less angry than he had been at the beginning of the stop.

Walport did not believe defendant's account of the "sale," and he asked defendant whether there were "large amounts of cash" or drugs in the car. Defendant became visibly nervous, crossed his arms, sat down on the hood of Walport's patrol car, and stared at the ground. Walport then listed individual drugs, and each time defendant responded by shaking his head and saying, "No." Walport asked defendant for permission to search the vehicle and provided defendant with a consent form, printed in Spanish and English, which defendant declined to sign. Walport successfully sought consent from the driver to search the car, but defendant informed Walport, "[the driver] doesn't own anything in the car, everything in the car belongs to me." Accordingly, Walport did not rely on the driver's consent to search the car.

At 4:29 a.m., Walport received a return on the warrant check for defendant and the driver; both were

clear. Walport declined to write a traffic citation, however. Instead, at 4:40 a.m., he called Oregon State Trooper Costanzo, who arrived on the scene at 5:05 a.m. with Cookie, a certified drug-detection dog. While performing a dog sniff of defendant's vehicle, Cookie alerted to the presence of drugs. Relying on Cookie's alert, Costanzo searched the vehicle and ultimately found approximately five pounds of methamphetamine hidden behind a panel in the passenger compartment.

Defendant was indicted for one count each of manufacturing, delivering, and possession of methamphetamine, ORS 475.886; ORS 475.890; ORS 475.894, and one count of providing false information to a police officer, ORS 162.385. Defendant pleaded not guilty and moved to suppress all evidence obtained in the search of his vehicle, contending that the search violated his rights under Article I, section 9.[3] In a series of memoranda in support of suppression, defendant argued that Walport lacked reasonable suspicion to detain defendant and that Walport had unlawfully seized defendant's vehicle, both in violation of Article I, section 9.

The trial court denied defendant's suppression motion, concluding that "[w]hile no one factor in this case would be sufficient to support reasonable suspicion of criminal activity, taken as a whole there is adequate evidence to support such suspicion." The trial court did not specify the criminal activity that Walport reasonably suspected. The order denying suppression notes that defendant's unbelievable story rendered objectively reasonable Walport's suspicion that defendant's vehicle was stolen. The order did not address whether any of the evidence known to Walport supported a reasonable suspicion of drug trafficking or other *drug-related* criminal activity. Nevertheless, the court concluded that the extension of the traffic stop for purposes of the dog sniff was reasonable.

---

[3] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

In light of the trial court's ruling, defendant entered a conditional no-contest plea to one count of possession of methamphetamine. Defendant reserved his right to appeal the trial court's denial of his suppression motion.

On appeal, defendant renews his arguments under Article I, section 9, that he was unlawfully stopped, that his vehicle was unlawfully seized, and that the dog sniff and subsequent discovery of methamphetamine were the product of police exploitation of those ongoing unlawful seizures. In turn, the state contends that Walport developed reasonable suspicion to investigate car theft and drug trafficking during the traffic stop and that the subsequent investigation, including the dog sniff of defendant's vehicle, was reasonable.

A stop of a person by a police officer is supported by reasonable suspicion when the officer subjectively believes that the person has committed or is about to commit a crime and that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop. *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997); *State v. Espinoza-Barragan*, 253 Or App 743, 747, 293 P3d 1072 (2012). To be objectively reasonable, the officer's suspicion must be based on specific and articulable facts. *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993). A police officer's training and experience are relevant considerations that bear on the reasonable factual inferences that an officer may draw. *State v. Hudson*, 253 Or App 327, 340, 290 P3d 868 (2012).

As a preliminary matter, it appears that the trial court based its order denying suppression on the notion that reasonable suspicion of criminal activity, in the abstract, justifies the investigation of other crimes for which an officer may not have developed reasonable suspicion. Likewise, the state argues that, even if Walport lacked reasonable suspicion that defendant was engaged in drug trafficking, the drug investigation was nevertheless justified by Walport's reasonable suspicion that defendant's car was stolen. We recently rejected that argument in *State v. Kentopp*, 251 Or App 527, 284 P3d 564 (2012). There, a police officer extended a traffic stop in order to investigate whether the driver possessed a controlled substance. *Id.* at

531 & n 4. The state argued that that extension was justified because the officer had developed reasonable suspicion that the defendant was not licensed to drive, had stolen the car he was driving, and was preparing to flee the scene. *Id.* We disagreed, concluding that "an officer's reasonable suspicion about certain crimes *does not justify* the officer's extension of a stop to conduct an investigation of another crime for which the officer does not also have reasonable suspicion." *Id.* at 534 (emphasis in original). Accordingly, to the extent that the trial court's order was based on that premise, it was erroneous.

Here, there are two significant points at which we must determine whether the stop of defendant was supported by reasonable suspicion. The first, unsurprisingly, is the moment at which Walport initially stopped defendant by requesting his identification and retaining it in order to conduct a warrant check. *See State v. Ayles*, 348 Or 622, 628, 237 P3d 805 (2010) (passenger in stopped vehicle seized when officer retained his identification card). The second was when Walport shifted from investigating whether defendant's vehicle was stolen to whether defendant was engaged in drug trafficking. *See State v. Klein*, 234 Or App 523, 532, 228 P3d 714 (2010) (holding that the expansion of an inquiry into matters about which an officer lacks reasonable suspicion extends the duration of a stop in violation of Article I, section 9). We conclude that the stop was supported by reasonable suspicion at its onset but that Walport lacked reasonable suspicion to extend it to investigate drug trafficking.

Turning to the onset of the stop, Walport testified at the suppression hearing that, by the time he asked for defendant's identification, he suspected that the vehicle might have been stolen. We view that suspicion in light of the totality of the circumstances known to Walport at the time. Those circumstances are as follows: Defendant's vehicle was stopped at 4:00 a.m. in southern Oregon, but it did not immediately pull over, instead continuing for approximately one-half mile. On arriving at the car, Walport noted that defendant appeared angry and avoided eye contact. When asked, both defendant and the driver

produced Oregon driver's licenses, though the vehicle in which they were traveling was registered in California to an individual who was not present. When asked if he owned the vehicle, defendant, in short succession, claimed that he did *not* own the vehicle, which belonged to a friend; that the vehicle did not belong to a friend, but to a friend of a friend; and, finally, that defendant *did* own the vehicle, because he had recently purchased it from "Monzo," whose name defendant could not immediately recall. Defendant had no paperwork for the sale, and the interior of the vehicle— which contained trash and an apparently long-installed child's car seat—did not appear to be consistent with a recent purchase. In light of the circumstances surrounding the stop and, particularly, in light of defendant's inconsistent and contradictory account of the vehicle's ownership, we conclude that Walport's suspicion that the car had been stolen was objectively reasonable. Accordingly, Walport was justified in conducting a reasonable investigation to determine whether his suspicion was founded, including requesting defendant's identification and asking defendant to accompany Walport to his patrol vehicle for follow-up questioning.

That conclusion, however, does not end our analysis. The record is clear that Walport stopped investigating whether the vehicle was stolen yet detained defendant for approximately 35 minutes while awaiting the arrival of Costanzo and Cookie, thereby unquestionably extending the duration of the stop. At the suppression hearing, Walport testified that, before that detention, he had developed reasonable suspicion that "some sort of crime was occurring" and, specifically, that he believed that defendant was either involved in drug trafficking or that the vehicle was stolen. However, when asked whether he took any action to determine whether the vehicle was stolen during the 35-minute delay, Walport testified that he had not. Thus, because he had stopped investigating whether the vehicle was stolen, Walport was justified in continuing to detain defendant to investigate drug trafficking only if the detention was supported by reasonable suspicion of that crime. *See Kentopp*, 251 Or App at 532. And we conclude that, on this record, no such reasonable suspicion existed.

At the suppression hearing, Walport testified that his suspicion arose out of defendant's "story that wasn't making sense about the vehicle and the different indicators that [he] was seeing in the vehicle." Therefore, we examine defendant's implausible story and the other facts on which Walport relied to determine whether they support a reasonable suspicion of drug activity.

We begin with the "indicators" that Walport testified had aroused his suspicion. Those "indicators," as Walport identified them, were (1) the California license plates of the vehicle and its passage northbound on I-5 at 4:00 a.m., (2) the third-party registration of the vehicle, (3) the existence of identical prepaid cellular phones in the vehicle, (4) the religious medallion affixed to the rearview mirror of the vehicle, and (5) the lack of visible luggage in the passenger compartment of the vehicle. In addition, Walport noted that defendant had immediately offered inconsistent explanations about the ownership of the car.

As an initial matter, we decline to consider two of those "indicators"—the religious medallion and the lack of visible luggage—in our reasonable suspicion calculus. Regarding the religious medallion, Walport testified only that the medallion was "some sort" of Christian necklace and that, in his experience, "people transporting narcotics often have certain religious symbols hanging in their vehicle." We have declined to consider a similar observation because of the serious constitutional concerns raised by reliance on such evidence. *See State v. De La Rosa*, 228 Or App 666, 674 n 2, 208 P3d 1012 (2009) (declining to consider observation of a "Jesus Malverde" medallion, despite "detailed testimony" regarding the specific medallion's significance to drug dealers). We likewise decline to do so here.

Regarding the lack of visible luggage, we have on several occasions held that a lack of visible luggage adds nothing to the reasonable suspicion inquiry if luggage may have readily been stored out of the officer's plain view. *See Espinoza-Barragan*, 253 Or App at 752 ("An officer cannot conclude that a driver is not carrying any luggage if the officer does not, or cannot, look into places in the driver's vehicle that are likely to hold luggage."); *State v. Juarez-*

*Godinez,* 135 Or App 591, 607, 900 P2d 1044 (1995), *aff'd on other grounds,* 326 Or 1, 942 P2d 772 (1997) ("The lack of visible luggage also adds nothing, because, with three adults riding in the vehicle, any luggage would likely have been placed in the trunk."). Here, Walport could not have seen into the trunk, where defendant explained that he and the driver were keeping their bags. Therefore, the lack of *visible* luggage in no way affects our reasonable suspicion analysis.

Walport's remaining "indicators" each carry little weight in establishing reasonable suspicion. As to the first indicator, Walport did not explain the significance of the vehicle's California license plates or its presence on I-5—aside from acknowledging that I-5 is a road regularly used for narcotics trafficking—at the suppression hearing. Similarly, with regard to the second indicator, Walport testified that "often people engaging in criminal enterprises will use a third-party vehicle to help them distance themselves from whatever contraband * * * may be in the vehicle." Finally, with regard to the third indicator, Walport testified that, based on his training and experience, he knew that "often drug dealers [and] people engaging in different criminal enterprises use those types of phone[s,]" *viz.,* prepaid cellular phones, because they are difficult to trace. However, Walport acknowledged that he knew of no restrictions on the purchase or use of prepaid cellular phones and that they can be lawfully acquired with ease—by criminals and noncriminals alike.

To the extent that Walport associated those facts with drug trafficking—or other, unspecified criminal conduct—they were insufficient to establish a reasonable suspicion of that criminal activity. *See, e.g., State v. Dominguez-Martinez,* 321 Or 206, 208 n 1, 213 n 6, 895 P2d 306 (1995) (noting that noncriminal characteristics— "type of vehicle; California plates; travel from California to Washington; young, Hispanic men; and lack of luggage"— failed to establish reasonable suspicion); *Juarez-Godinez,* 135 Or App at 607 (concluding that the fact that the defendant was driving a car registered to a third party was not sufficient to justify the extension of a traffic stop).

We next consider the factors identified by Walport in light of the totality of the circumstances known to him when he extended the stop of defendant to investigate whether defendant was engaged in drug trafficking. Specifically, we examine defendant's implausible story about the provenance of the vehicle to determine whether it supports a reasonable suspicion of drug trafficking.[4]

That story, in short, is as follows: Defendant left Woodburn in an unspecified car and drove to Oakland to visit Junior. While in Oakland, defendant decided that he wanted to buy the vehicle in which he was stopped, and Junior introduced defendant to Monzo on a street corner. There, defendant "bought" the vehicle and, leaving his original car in Oakland, began driving back to Woodburn on a "test drive" of approximately 600 miles. Defendant had no contact information for Monzo, had no idea how he would reclaim his other car, had no idea how he would send Monzo payment, and had not agreed to a purchase price for the vehicle.

That story is certainly suspicious. And, as with defendant's initial, inconsistent account of the vehicle's ownership, it raises a reasonable suspicion that the vehicle may have been stolen—or was otherwise being put to some unauthorized use. We could speculate—and it is possible— that, based on his training and experience, Walport also knew defendant's behavior to be consistent with that of drug traffickers. Perhaps it is common for drug traffickers to drive from one state to another in one vehicle, only to exchange vehicles with a remote acquaintance and immediately return. Thus, perhaps Walport could have drawn a reasonable inference, based on his training and experience, that defendant was engaged in drug trafficking. The problem, however, is that there is insufficient evidence in the record to support that inference. And, in the absence of such evidence in the record, any inference that Walport—

---

[4] Walport also noted that defendant's demeanor changed when Walport began inquiring about drugs. As we have in prior cases, we conclude that that change in demeanor could be ascribed to "any number of things," *see, e.g., State v. Holdorf*, 250 Or App 509, 514, 280 P3d 404, *rev pending* (2012), including the sudden realization that a mere traffic stop is escalating into a criminal investigation. Accordingly, we accord it little weight.

or, for that matter, the trial court—may have drawn about drug trafficking from defendant's implausible story was impermissibly—and unreasonably—speculative. Therefore, defendant's story, alone or considered along with the other "indicators," was not an adequate basis to support a reasonable suspicion that defendant was engaged in drug-related criminal activity.

Our conclusion is informed by *State v. Kolb*, 251 Or App 303, 283 P3d 423 (2012). In *Kolb*, the defendant had been a passenger in a lawfully stopped vehicle, she exhibited various physical manifestations consistent with recent methamphetamine use, and she was subsequently detained by the police officer conducting the traffic stop. We considered whether the defendant's condition supported a reasonable suspicion that she possessed evidence of the crime of unlawful possession of methamphetamine. At a suppression hearing, the officer testified that, based on his training and experience, he knew that people who were under the influence of methamphetamine commonly have drug paraphernalia with them—for example, pipes, needles, or syringes.

The trial court denied the defendant's suppression motion, relying on a "fair inference" that a person under the influence of methamphetamine would have the substance in their possession, in the form of residue located on drug paraphernalia. *Id.* at 308. We reversed, and explained that, "If the premises [underlying a finding of reasonable suspicion] collectively are impermissibly speculative, or if any of the premises is individually insupportable, the stop was not supported by reasonable suspicion." *Id.* at 313. Applying that principle, we noted that several of the inferences underlying the trial court's ultimate conclusion were not based in the officer's explicit testimony. *Id.* at 314. Because nothing in the officer's testimony would substantiate the trial court's premises, we held that the court erred in concluding that the stop was supported by reasonable suspicion. *Id.* at 315.

Here, as in *Kolb*, no connection was offered between defendant's bizarre story and the crime of drug trafficking. Likewise, on this record, any inferential connection was

too speculative. Thus, we conclude that neither Walport's indicators nor defendant's story—individually or in totality —provided reasonable suspicion of drug trafficking. Therefore, Walport's detention of defendant while awaiting a drug-detection dog unlawfully extended the duration of the stop in violation of Article I, section 9, and the drug evidence discovered during the search based on the dog sniff must be suppressed.

Reversed and remanded.