Argued and submitted January 29, 2015, affirmed June 22, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JACOB NATHANIEL BARBER,
*Defendant-Appellant.*

Marion County Circuit Court
12C46161; A154582

379 P3d 651

Jason E. Thompson argued the cause for appellant. With him on the brief was Ferder Casebeer French & Thompson LLP.

Jona J. Maukonen, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

## DUNCAN, P. J.

Defendant appeals a judgment convicting him of one count of possession of heroin, arguing that the trial court erred in denying his motion to suppress evidence discovered during an extension of a traffic stop.[1] The trial court determined that the evidence against defendant was discovered after a police officer lawfully stopped defendant for a traffic violation and extended the stop to investigate whether he possessed drugs. Defendant argues that the extension of the stop violated Article I, section 9, of the Oregon Constitution because it was not supported by reasonable suspicion that defendant possessed drugs and that the evidence should have been suppressed because the officer exploited the unlawful detention to gain defendant's consent to search the car. Defendant also argues, in the alternative, that the evidence should have been suppressed because his consent to the search was involuntary. We conclude that the extension of the stop was supported by reasonable suspicion that defendant possessed drugs and that defendant voluntarily consented to the search of the car. Accordingly, we affirm.

We state the facts consistently with the trial court's explicit and implicit findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In August 2012, Salem Police detectives in the Street Crimes Unit were conducting surveillance of the apartment of a suspected heroin dealer. After a detective, Bennett, observed suspicious behavior, described in more detail below, by two men in a Subaru, he asked another detective, Miller, to follow the car to further observe the men and eventually make a stop. Miller followed the car briefly and then called a patrol officer, Morrison, and explained that the detectives had been following the Subaru as a result of the occupants' "possible drug activity" related to the apartment that the detectives were watching. Miller told Morrison that a detective had been watching an apartment as part of a drug investigation when he saw two men in a Subaru in the parking lot of the apartment complex. It was Morrison's understanding that the detective saw one of the men go up to the apartment under surveillance and then

---

[1] Defendant was also acquitted of one count of distribution of heroin. That disposition is not at issue on appeal.

quickly come back to the car, where he and the other man "engaged in possible drug activity" for a short time before leaving in the car.[2] Miller asked Morrison to locate and follow the car and "develop probable cause to stop the car and identify the occupants."

A few minutes later, Morrison located the Subaru on the road he was on, heading in the opposite direction. He did a U-turn to come up behind it, and defendant, who was driving, quickly turned the car into the parking lot of a motel without signaling his turn. In Morrison's experience, that particular motel was a frequent site of drug activity. Having observed defendant's failure to signal, a traffic violation, ORS 811.335(1)(b), (3), Morrison turned on the overhead lights on his marked patrol car in order to stop defendant for the violation.

Defendant did not stop his car immediately. Instead, he drove through the motel parking lot for approximately 35 yards at a very slow speed, which indicated to Morrison that defendant knew that Morrison was there. Defendant passed numerous open parking places and a fire lane where there was room to stop safely without impeding traffic. Instead, defendant continued to the back of the parking area, turned right, and parked in a parking stall at the very back of the complex. While defendant drove through the parking lot, he looked at his passenger, who was reaching down underneath the seat. That behavior made Morrison concerned, first, that the passenger might be reaching for weapons and, next, that defendant and the passenger were trying to conceal something—perhaps drugs—in the car.

Morrison parked his car behind defendant's, blocking him in, then went up to the car and identified himself.

---

[2] Because, as explained below, 279 Or App at 89-91, the relevant legal question is whether Morrison reasonably suspected that defendant possessed drugs, we state the information that Miller relayed to Morrison as Morrison understood it even though Morrison's understanding differs, to some extent, from what Bennett and Miller testified to. *See State v. Hiner*, 240 Or App 175, 181, 246 P3d 35 (2010) (facts that deputy perceived "gave rise to a reasonable (though ultimately mistaken) belief that defendant had violated his probation" and, accordingly, justified a seizure of the defendant). *Cf. State v. Boatright*, 222 Or App 406, 410, 193 P3d 78, *rev den*, 345 Or 503 (2008) ("[P]robable cause may be based on a mistake of fact.").

He told defendant that he had stopped him for not signaling his turn into the parking lot. Defendant responded that he had turned suddenly because he believed the driveway he had turned into was the only entrance to the motel. Morrison asked why defendant was at the motel, and defendant responded that he was staying at the motel for the night. Then Morrison asked defendant "if he had any weapons in the car or drugs or anything of that nature inside the car." Defendant responded, "I don't think I have any drugs." Morrison responded, "Hey. That doesn't sound very convincing. Do you or do you not have drugs in the car?" The record does not reveal defendant's response to that question.

During the conversation that followed, Morrison asked defendant if he and the passenger were from the area. They responded that they were, and Morrison explained to defendant that, in his experience, a lot of people go to that motel to use drugs or engage in illegal activities. At some point, Morrison also obtained defendant's license, registration, and insurance information.

Morrison asked defendant for consent to a search of the car for "drugs, weapons, anything of that nature." Defendant asked, "Hey. What happens if I say no; if I say no to consent to the vehicle [search]?" Morrison responded that "that was well within his rights." Defendant asked again what would happen if he did not consent. Morrison explained, "I could do a number of things. I could apply for a search warrant, I could call for a drug dog, or I could just drive away." Defendant asked what would happen if Morrison found drugs, and Morrison explained, "I'd investigate that and proceed accordingly."

Defendant was hesitant, so Morrison gave him a card advising him of his rights. He explained, "I'll just have you read the card and if you agree with it then you can give consent. If not then we can move on." After reading the card, defendant told Morrison that he did not want to consent to a search. Then he asked what Morrison was going to do next. Morrison told him, "I was going to go fill out a traffic warning complaint for the turn signal and see if a drug dog was working at the time." Defendant asked what the dog was

going to do, and Morrison explained that the dog would walk around the car, and "if he alerted to the odor of a drug then we would proceed forward with that."

Morrison left to go back to his car. As he was going to his car, defendant stuck his arm out and hailed Morrison, who went back toward defendant. Defendant asked to read the consent-to-search card again and then signed the card, giving consent.

At that point, defendant and the passenger got out of the car, and the passenger left the scene. Morrison called Miller, who came to help search the car. During the search, Morrison and Miller found the disputed physical evidence, and, when questioned about the evidence, defendant made incriminating statements.

Defendant was arrested and charged with one count of possession of heroin and one count of distribution of heroin. He moved to suppress the evidence discovered during the search and his statements, arguing that Morrison unlawfully extended the traffic stop without reasonable suspicion that defendant possessed drugs and, alternatively, that defendant's consent to the search was involuntary. The trial court denied the motion, concluding that Morrison had reasonable suspicion to detain defendant while he conducted a drug investigation and that defendant's consent was voluntary. After a bench trial, the court convicted defendant of possession of heroin and acquitted him of distribution. This appeal followed.

On appeal, defendant renews his contention that Morrison unlawfully extended the traffic stop without reasonable suspicion of drug possession when he asked defendant whether he had any drugs or weapons in the car.[3] Defendant argues that Morrison exploited that unlawful stop to obtain defendant's consent to the search of his car, and, accordingly, that the evidence obtained as a result should have been suppressed. He also renews his alternative argument that his consent was involuntary.

---

[3] Defendant did not contend below, and does not contend on appeal, that Morrison needed, and lacked, additional justification to extend the stop by asking about weapons. Accordingly, we do not consider that question.

Article I, section 9, protects individuals against unreasonable searches and seizures.[4] In order to be reasonable, a warrantless search or seizure must fall within "one of the few specifically established and well-delineated exceptions to the warrant requirement." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (internal quotation marks omitted). It is the state's burden to prove that an exception to the warrant requirement justified a warrantless search or seizure. *Id.* If the state does not carry that burden, the court must exclude evidence derived from the search or seizure. *State v. Hall*, 339 Or 7, 21, 115 P3d 908 (2005); *State v. Unger*, 356 Or 59, 93, 333 P3d 1009 (2014).

Valid consent provides an exception to the warrant requirement. *Hall*, 339 Or at 20. Consent is invalid if it is involuntary or if it is derived from a violation of the defendant's rights under Article I, section 9. *Id.* at 20-21. Evidence that is the product of invalid consent is subject to suppression because "the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if 'the government's officers had stayed within the law.'" *Id.* at 24 (quoting *Davis*, 295 Or at 234). In this case, to determine whether the state carried its burden of proving that defendant's consent to the search of his car was valid, we first consider defendant's primary argument, that is, that his consent was derived from a violation of his right to be free from unreasonable seizures under Article I, section 9. *See Unger*, 356 Or at 85.

As noted above, the trial court held, and the parties agree, both that Morrison lawfully stopped defendant for the traffic violation and that Morrison extended the traffic stop by asking whether there were any weapons or drugs in the car. The parties disagree as to whether the extension of the stop was lawful. To be lawful, an extension of a traffic stop to conduct a criminal investigation must be justified by reasonable suspicion of criminal activity. *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010); *see also, e.g., State v. Maciel*, 254 Or App 530, 537, 295 P3d 145 (2013) (officer

---

[4] Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

was justified in extending traffic stop "to investigate drug trafficking only if the detention was supported by reasonable suspicion of that crime"). Thus, the first question for us is whether Morrison had reasonable suspicion that defendant possessed drugs when he extended the stop by asking if there were drugs in the car.

Because Morrison's suspicion was based, in part, on information that he received from the detectives, we apply the collective knowledge doctrine in answering that question. *See State v. Holdorf*, 355 Or 812, 825, 333 P3d 982 (2014) ("[T]he collective knowledge doctrine * * * applies when a police officer reasonably relies on information from other officers in making a determination that a stop is justified based on articulable facts that criminal activity is afoot."). Thus, in evaluating whether Morrison's suspicion was reasonable, we consider the information and conclusions that Miller communicated to Morrison about the drug investigation and the occupants of the Subaru, as well as Morrison's own observations. *See id.*; *State v. Porter*, 31 Or App 285, 289, 570 P2d 396 (1977) ("Having * * * been informed [by Officer Burger] that Irving was a reliable informant, [the officers who arrested the defendant] were entitled to act on the assumption that Burger was aware of facts in support of his conclusion."). We do not consider, however, the detectives' knowledge or inferences based on their training and experience to the extent that they were not part of the information that Miller communicated to Morrison. *See Holdorf*, 355 Or at 825 ("courts must consider the totality of the circumstances *confronting an officer* in making [the reasonable suspicion] determination"; that includes "information from other officers" on which the officer reasonably relies (internal quotation marks omitted; emphasis added)).[5]

---

[5] The collective knowledge doctrine also applies in situations, unlike this one, where an officer who lacks individualized suspicion stops, searches, or arrests a suspect at the behest of another officer who does have either reasonable suspicion or probable cause, whichever is required to justify the intrusion. *State v. Soldahl*, 331 Or 420, 427, 15 P3d 564 (2000) ("[T]he [collective knowledge] doctrine *permits a police officer to* [arrest a suspect] if the officer reasonably relies on instructions from an officer who has probable cause."); *State v. Radford*, 222 Or App 87, 89, 191 P3d 776 (2008) ("'[A] peace officer who does not himself have probable cause to arrest a felony suspect nonetheless may arrest the suspect if he *reasonably* believes that the officer or officers who have requested the arrest do have probable cause to make that arrest and if probable cause to arrest does, in

Accordingly, we have stated the facts known to Morrison in accordance with the evidence in the record about what Miller communicated to Morrison and the inferences that Morrison drew from those communications. Although Miller and, particularly, Bennett, testified to additional facts about the behavior of the Subaru's occupants, that uncommunicated information is not relevant to our determination of whether Morrison reasonably suspected defendant of possessing drugs.[6]

---

fact, exist.'" (Quoting *State v. Pratt*, 309 Or 205, 216, 785 P2d 350 (1990) (emphasis in *Pratt*).)); *see also Soldahl*, 331 Or at 428 (noting that the doctrine applies to both seizures and searches; thus, "it follows that an officer reasonably may rely on a fellow officer's direction to stop a vehicle for a traffic infraction"). Here, the doctrine does not apply in that way because it is undisputed that the detectives did not instruct Morrison to stop defendant based on their suspicion that the Subaru's occupants were involved in drug activity. Instead, Miller instructed Morrison to develop his own probable cause for a traffic stop.

[6] In a few cases involving informants, we have held that the question for determining whether reasonable suspicion exists is "whether the information possessed collectively by [an officer and a dispatcher] gave rise to a reasonable suspicion that defendant had committed a crime." *State v. Black*, 80 Or App 12, 16, 721 P2d 842 (1986); *see also State v. Walsh*, 103 Or App 517, 520, 798 P2d 262 (1990), *rev den*, 311 Or 60 (1991) (citing *Black* for that proposition); *State v. Mesenbrink*, 106 Or App 306, 310, 807 P2d 306, *rev den*, 312 Or 235 (1991) (citing *Walsh* for that proposition).

To the extent that, in those cases, we considered the question as one unmoored from the knowledge or belief of any individual officer and, instead, simply considered all of the facts known to all law-enforcement personnel to decide whether they amounted to reasonable suspicion, our approach was at odds with the Supreme Court's then-existing and more recently reasserted view of the collective knowledge doctrine. *See State v. Groda*, 285 Or 321, 324, 591 P2d 1354 (1979) (expressly adopting rule applied in *State v. Mickelson*, 18 Or App 647, 650-51, 526 P2d 583 (1974), and articulating that rule as follows: "[T]he searching officer personally must have information which constitutes probable cause, or the searching officer must be directed to make the search by an officer who personally has that knowledge. It is sufficient if the officer making the search on his own knowledge has secured the knowledge from another officer."); *Mickelson*, 18 Or App at 650 (holding that another officer's knowledge could not be imputed to the searching officer and observing that holding otherwise "would encourage police officers to search on the hope that the total knowledge of all those officers involved in a case will later be found to constitute probable cause if the search is challenged"); *see also Soldahl*, 331 Or at 428 (reaffirming holding of *Groda* and noting that, "[a]s a unit, officers may direct one another to carry out lawful police activities. However, the state retains the obligation at trial to establish that police action was *initiated by an officer who had both objective and subjective probable cause*" (emphasis added)); *Holdorf*, 355 Or at 825 (reaffirming *Soldahl*).

Accordingly, to the extent that, in *Black*, *Walsh*, and *Mesenbrink*, we applied an understanding that a criminal stop is justified if all the facts known to all law-enforcement personnel, considered as a whole, amount to reasonable suspicion, that understanding does not survive the Supreme Court's subsequent decisions in *Soldahl* and *Holdorf*.

We turn to the reasonable suspicion determination. "A stop of a person by a police officer is supported by reasonable suspicion when the officer subjectively believes that the person has committed or is about to commit a crime and that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop. To be objectively reasonable, the officer's suspicion must be based on specific and articulable facts." *Maciel*, 254 Or App at 535 (internal citations omitted). We understand defendant's argument on appeal, as it relates to reasonable suspicion, to be limited to whether Morrison's subjective belief that defendant possessed drugs was objectively reasonable.[7]

Defendant's argument that Morrison lacked reasonable suspicion consists only of the unelaborated assertion that Morrison "failed to present 'particularized' conduct by defendant to warrant questioning defendant about anything other than the traffic stop." As explained below, we disagree. Morrison's suspicion that defendant possessed drugs was based on (1) the information that one of the two men in the Subaru had gone to an apartment that was under surveillance for suspected heroin distribution and quickly returned to the car; (2) the information that the two men then engaged in possible drug activity before leaving; (3) the fact that, after defendant turned into the motel parking lot and after Morrison turned on his overhead lights, defendant slowly drove to the very back of the parking lot while he watched the passenger fumble under the seat, leading Morrison to suspect that the men were hiding something, perhaps drugs; and (4) the fact that defendant and the passenger were staying at the motel, which was a common location for drug activity.

Before the trial court, defendant argued that this case was similar to, and controlled by, *State v. Bertsch*, 251 Or App 128, 284 P3d 502 (2012). There, a sheriff's sergeant was conducting surveillance of two suspected drug apartments where he also believed that a wanted person was

---

[7] To the extent that defendant challenges the trial court's finding that Morrison subjectively believed that defendant possessed drugs when he extended the traffic stop to investigate drug possession, we reject that challenge because there is ample evidence in the record to support the finding.

spending time. He observed the defendant and a companion who was associated with drug users and dealers enter one of the apartments and leave a short time later. 251 Or App at 130. The defendant matched the description of the wanted person. *Id.* After leaving the apartment, the defendant and her companion got into the defendant's car and drove away. *Id.* After the sergeant observed a traffic violation, he requested that a marked police vehicle make a stop for the traffic infraction and to investigate whether the defendant was the wanted person. *Id.* Two officers initiated a traffic stop, during which they learned that the defendant's license was suspended and that she was not the wanted person. Then one of the officers turned the stop of the defendant over to the sergeant, who began a drug investigation that culminated in the defendant consenting to a search of the vehicle and the sergeant discovering drugs. *Id.* at 131-32.

The defendant was convicted after her motion to suppress the evidence was denied, and she appealed. *Id.* at 132. We held that the sergeant lacked reasonable suspicion to extend the stop to investigate whether the defendant possessed drugs. We explained:

> "We have repeatedly said that a person's presence in a location associated with drug activity is insufficient to support an objectively reasonable belief that that person is himself or herself engaged in drug activity. *See, e.g.,* [*State v.*] *Rutledge*, 243 Or App [603,] 610[, 260 P3d 523 (2011)] (facts were insufficient to establish reasonable suspicion where the defendant 'had just left a motel that the police believed was involved in drug activity, was in a car with a person suspected of drug activity, and acted nervously when asked about her purse'); *State v. Zumbrum*, 221 Or App 362, 369-70, 189 P3d 1235 (2008) (officers lacked reasonable suspicion that the defendant was involved with methamphetamine where he was staying in an apartment building with a high incidence of methamphetamine production and another individual staying in the apartment with the defendant was involved in drug dealing)."

*Id.* at 134.

Accordingly, we held that

> "[i]t was not reasonable to infer that defendant, merely because she entered a residence associated with drug

activity, was herself involved in criminal activity. The fact that defendant's presence at that location was brief, as opposed to some longer duration, does not alter that conclusion. *See State v. Broughton*, 221 Or App 580, 584, 193 P3d 978 (2008), *rev dismissed*, 348 Or 415 (2010); *State v. Loud*, 149 Or App 250, 254, 942 P2d 814, *rev den*, 326 Or 58 (1997) (circumstances did not give rise to reasonable suspicion where the defendant had a 'brief visit' with a suspicious person in an area known for drug sales)."

*Id.*

This case differs from *Bertsch* in a significant way. In *Bertsch*, we explained that a defendant's mere presence in a location associated with drug activity, even if it is of short duration, does not indicate that the person him- or herself is engaged in drug activity. Here, however, Morrison knew more than just that defendant had been present at a location associated with drug activity; he also knew that, immediately after leaving the apartment that the detectives were monitoring for heroin dealing, defendant and his companion had sat in the car and engaged in what the detectives identified as possible drug activity. That additional information casts defendant's brief trip to the apartment in a different light. In contrast to the situations in *Bertsch* and the cases cited in the quotes from *Bertsch*, above, where the defendants' presence in places and with people associated with drugs did not independently allow the inference that the defendants were themselves engaged in drug activity, here, the detectives' observation of possible drug activity made it more likely that defendant's trip to the apartment involved drug activity.

Defendant's conduct after Morrison turned on his overhead lights to stop the car also made it more likely that defendant's visit to the apartment was related to drugs and that defendant possessed drugs. Defendant's slow driving through the motel parking lot while watching the passenger fumble under the seat after it was apparent that Morrison was signaling for him to stop suggested that defendant and the passenger had something in the car that they did not want Morrison to see. Under the circumstances, that conduct both strengthened the inference that defendant and his

companion had, in fact, bought drugs at the apartment and engaged in drug activity in the car and supported an inference that they still had drug-related evidence—as Morrison inferred, maybe drugs—in the car. *See State v. Rudnitskyy*, 266 Or App 560, 565, 338 P3d 742 (2014), *rev den*, 357 Or 112 (2015) (defendant's furtive attempt to hide a straw, which officer knew to commonly be used for smoking heroin, contributed to reasonable suspicion in light of informant's report that defendant had participated in a drug transaction moments before); *see also State v. Butkovich*, 87 Or App 587, 591, 743 P2d 752, *rev den*, 304 Or 548 (1987) ("Where there is evidence that criminal activity has in fact just occurred, [a furtive] gesture may provide a basis for believing that the actor has participated in it. However, in the absence of any evidence of criminal activity, furtive gestures provide no basis for a stop." (Internal citation omitted.)).

The fact that defendant and his companion were staying at the motel, which Morrison knew to be a frequent site of drug activity, contributes only minimally to our analysis. *See, e.g., State v. Valdez*, 277 Or 621, 623, 628-29, 561 P2d 1006 (1977) (presence of people who looked like drug dealers in the parking lot of a motel whose customers were "mostly prostitutes, drug dealers, truck drivers, salesmen, and a few tourists" did not contribute to reasonable suspicion). Nevertheless, the totality of the circumstances—the information Morrison received about the conduct of defendant and his companion at the apartment complex, as well as Morrison's own observations of their conduct—made Morrison's suspicion that defendant possessed drugs reasonable. Thus, Morrison's extension of the traffic stop to investigate drug activity was not unlawful, and, consequently, defendant's subsequent consent was not tainted by an unlawful seizure.

We turn to defendant's contention that his consent was not voluntarily given. Defendant argues that he merely acquiesced to a search of the car, rather than affirmatively consenting to it, because Morrison's conduct and statements demonstrated that a search was inevitable; in defendant's view, Morrison communicated that defendant would be detained until he consented or a search was conducted in

some other way. *See State v. Berg*, 223 Or App 387, 392, 196 P3d 547 (2008), *adh'd to as modified*, 228 Or App 754, 208 P3d 1006, *rev den*, 346 Or 361 (2009) ("[Mere] acquiescence occurs when an individual is not given a reasonable opportunity to choose to consent or when he or she is informed that a search will occur regardless of whether consent is given."). Implicit in defendant's argument, as we understand it, is the contention that Morrison exceeded his authority by indicating that a search was inevitable. Otherwise, we do not understand, and defendant does not explain, how Morrison's communication would have had an unduly coercive effect on defendant's decision to consent to the search. *See State v. Rodal*, 161 Or App 232, 242, 985 P2d 863 (1999) ("'If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable.'" (Quoting *State v. Williamson*, 307 Or 621, 627, 772 P2d 404 (1989) (Carson, J., concurring).)); *Berg*, 223 Or App at 394 (officer's explanation that he would apply for a warrant if consent was not given was lawful and, accordingly, did not render consent involuntary).

Even assuming that defendant is correct in characterizing Morrison as having conveyed to him that he would be detained until a search occurred, we disagree with defendant that that was unlawful and, accordingly, unduly coercive. As explained above, defendant gave his consent to a search of the car soon after Morrison told him that he was returning to his patrol car to write a traffic citation and find out if a drug dog was working. From his discussion with Morrison, defendant knew that a drug dog would sniff the outside of the car and, if it alerted to the presence of drugs in the car, Morrison would investigate further. Given that, as we have concluded, Morrison had reasonable suspicion that defendant possessed drugs, Morrison could detain defendant for some period of time to investigate that suspicion. *See Maciel*, 254 Or App at 537 (noting that officer "was justified in continuing to detain defendant to investigate drug trafficking" for 35 minutes while a drug dog came to the scene "only if the detention was supported by reasonable suspicion of that crime"). Detaining defendant for a reasonable amount of time to bring a drug dog to the scene to sniff the outside of the car is among the steps that Morrison

could take as part of that investigation.[8] *See id.*; *cf. State v. Miller*, 267 Or App 382, 391-92, 340 P3d 740 (2014) (officer unlawfully prolonged traffic stop by deploying drug dog because he lacked reasonable suspicion of drug possession). *See generally State v. Watson*, 353 Or 768, 778-81, 305 P3d 94 (2013) (noting cases regarding traffic stops, detention of material witnesses, and searches based on officer safety concerns and explaining that "both Oregon statutes and this court's Article I, section 9, case law require that law enforcement officers have a justification for temporarily seizing or stopping a person to conduct an investigation, and that the officer's activities be reasonably related to that investigation and reasonably necessary to effectuate it"). Accordingly, if Morrison communicated to defendant that he would be detained while a drug dog came to the scene and sniffed the car, Morrison did not threaten something outside his authority.

Defendant points to no other reason for concluding that his consent was not voluntarily given. Therefore, the trial court did not err in determining that defendant's consent was voluntary.

Because defendant's consent was not tainted by a prior illegality and was not involuntarily given, the trial court did not err in denying defendant's motion to suppress.

Affirmed.

---

[8] Defendant does not contend that anything in the record suggests that calling for a drug dog would have taken so long that it would have been unreasonable to detain him until it arrived and sniffed the car. Accordingly, we need not, and do not, consider the length of any temporal limit on a reasonable detention for investigation.