Submitted January 30, reversed and remanded December 3, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JARED MATTHEW MILLER,
*Defendant-Appellant.*

Marion County Circuit Court
11C43232; A150565

340 P3d 740

Peter Gartlan, Chief Defender, and Laura E. Coffin, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Egan, Judge, and De Muniz, Senior Judge.

EGAN, J.

## EGAN, J.

Defendant was driving a car when the police stopped him for a traffic infraction. In the course of that stop, the officers came to believe that defendant was under the influence of a controlled substance. The officers questioned defendant and his passenger about controlled-substance use and requested that another officer bring a drug-detection dog to the scene to perform a sniff of the car. The dog alerted to the car; the officers then searched it and discovered heroin and related paraphernalia. In this appeal from the ensuing judgment of conviction for delivery of a controlled substance, defendant contends that the trial court erred in denying his pretrial motion to suppress that evidence. He argues that, under *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010), the officers unlawfully extended the traffic stop by commencing a drug investigation and that the extension of the stop was not supported by a reasonable suspicion of criminal activity. For the reasons below, we conclude that the trial court correctly denied defendant's motion to suppress the evidence obtained from the beginning of the stop to the point at which the officers deployed the dog. However, we agree with defendant that the deployment of the drug-detection dog unlawfully prolonged the stop, was not supported by an objectively reasonable suspicion that drugs were in the car, and that suppression of the evidence obtained as a result of the dog's deployment was required in consequence.

We review the trial court's denial of the motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 854 P2d 421 (1993). The trial court in this case did not make any explicit factual findings; therefore, where there is evidence from which particular facts could be decided in more than one way, we will presume that the court found the facts in a manner consistent with its legal conclusion so long as there is evidence in the record that would support those findings. *State v. Juarez-Godinez*, 326 Or 1, 7, 924 P2d 772 (1997).

Defendant was driving in front of a police cruiser when he made a turn without first signaling for at least 100 feet as required by ORS 811.335(1)(b). Salem Police Officer Gould was driving the police cruiser. Officer Horn was with

him. They signaled for defendant to stop. Defendant turned into the parking lot of a grocery store; he drove very slowly for approximately 50 yards, passing several open parking spaces before turning into one and stopping. There was one passenger in defendant's vehicle. It was 1:12 p.m. Gould approached to speak with defendant, and Horn approached to speak with the passenger. Gould asked for defendant's license, registration, and proof of insurance. In return, defendant provided him with a student identification card and stated that his license was suspended. Defendant also explained that the car belonged to a friend. Gould asked defendant questions about who owned the car, how defendant had come to be driving it, and where defendant lived. Throughout their conversation, Gould noticed that defendant appeared "very nervous" and that he was shaking. Gould also took note of defendant's "very slow" responses to his questions, which were delivered in a "monotone" voice and only after a "noticeable delay." Gould knew, from his experience and training, that those symptoms "oftentimes" resulted from controlled-substance use, and he began to look for other such symptoms. In that vein, he observed that defendant's pupils were "overly constricted," given the light of that day; he also observed needle marks on the inside of defendant's right arm. Gould knew, from experience and training, that hypodermic needle injections often left such marks. Gould testified that, within a minute of their initial contact, he believed that defendant was "likely under the influence of, for example, a narcotic analgesic."

Gould asked defendant what the needle marks were from; defendant replied that he had incurred them from drug use about a year before, but that he had not recently been using. Gould did not believe that explanation. As he later explained at the hearing on the motion to suppress:

"The marks appeared to be fairly fresh—recent that—I mean, and you can tell the difference between a recent bruise on somebody's arm as opposed to a scar, or a permanent mark that—of something that would have happened a year before. So it was plainly obvious to me, even though I'm not a doctor * * * of those that I've seen in the past, that it was very recent that those—those had been—been, you know—needles had been used on the arm."

Gould also explained that he believed that defendant had controlled substances in the vehicle:

"Well, in my mind, without questioning him, there was either something going on with the use, or—or sales of controlled substances. Oftentimes, they go hand-in-hand. Based on my observations on the initial—the reaction of the initial vehicle to it going at a very delayed place through the parking lot, contacting the driver, my physical observations of him, noticing track marks, his admitted use of—of narcotics, whether they were—you know, even though I saw the signs of recent use, but he said that he'd used a year ago, I believe that there was * * * at the very least, use of * * * controlled substances going on in—likely in the vehicle."

Gould continued to question defendant; defendant provided Gould with what Gould considered "vague" answers. Gould asked why he had turned into the parking lot; defendant said that he had done so in order to pick up a friend. Gould asked why he was meeting the friend; defendant paused, looked around, and said, "To go to the bank." Gould asked why he was going to the bank; after another pause, defendant replied that the friend owed him $40. Gould asked what the debt was for; defendant said that it was from a long time ago. Gould later testified that he asked those questions as part of a "drug investigation."

While Gould was talking with defendant, Horn was talking to defendant's passenger, Foster. Foster told Horn that they had arrived in the parking lot to meet a friend and take the friend to "a patio job." After Horn informed Gould of that inconsistency with defendant's story, Gould returned to his cruiser in order to run routine "wants checks," to investigate the status of defendant's driving privileges, and to fill out citations for the vehicular infractions that he had observed.[1] Gould testified that it took him two minutes to run the background-type checks and three to four minutes to complete each of two different citations for the vehicular infractions.

---

[1] Failure to carry or present a license is a misdemeanor criminal offense. ORS 807.570. Driving with a suspended or revoked license may be either a felony or misdemeanor offense. ORS 811.182. Failure to signal is a traffic violation. ORS 811.335(1)(b). For simplicity's sake, we will refer to those offenses and that violation collectively as the "vehicular infractions."

During the time that Gould was either talking to defendant or attending to the vehicular-infraction-related work in his cruiser, Horn requested that another officer, Miller, bring a drug-detection dog to the scene to perform a sniff of defendant's car. Horn made that request without asking Gould. The reason that Horn requested the dog owed to "suspicions" that he had developed while talking with the passenger, Foster. Horn later summarized those suspicions, stating that he recognized Foster from some sort of previous drug investigation (he also learned that Foster had recently been arrested on a "heroin charge"); Foster's eyes were red and bloodshot; he was talking slowly and repeating himself "over, and over, and over"; he kept putting his hand underneath his thigh, in what Horn perceived as an attempt to hide something from Horn; and he apparently did not want to put his feet on the coat that was resting on the floorboard beneath him. Horn believed that Foster was "probably" under the influence of a controlled substance. At the suppression hearing, the prosecutor asked Horn, "[D]o you have any experience with people showing signs such as those, and then having with them some kind of ingestion paraphernalia, or further possessing other controlled substances?" Without further elaboration, Horn answered, "Absolutely. Absolutely."[2]

Officer Miller arrived on the scene with the drug-detection dog at 1:30 p.m., 10 minutes after he had been called and 18 minutes from the stop's inception. Gould testified that he did not remember whether he had finished writing out his citations by that point, but that he had not yet given them to defendant. Miller deployed his dog around the car, but believed that the presence of defendant and Foster in the car was affecting the dog's ability to perform its task. Miller told Gould as much, and asked him if he would get the occupants out of the vehicle. Gould asked defendant and Foster to step out of the car. Once defendant was out of the car, Gould patted him down to search for any weapons that might pose a threat to the officers' safety. On a second pass, the dog "alerted" to the car, which indicated to the officers

---

[2] At some point, apparently while Gould was working on processing the citations, Horn asked for consent to search the vehicle; both defendant and Foster declined to give that consent.

that controlled substances were present. Gould testified that he then believed that he had probable cause to think that there was a controlled substance in the vehicle. He placed defendant in the back of his cruiser, stating that defendant was, at that point, under arrest for a "misdemeanor crime." The officers then searched the car. One of them found an eyeglass case in the pocket of a coat that was resting on the passenger-side floor; there was drug paraphernalia inside the case. Another officer discovered a black pouch beneath the "driver's side console"; the pouch contained heroin and related paraphernalia.

Before trial, defendant moved to suppress all evidence discovered as a result of what he contended was an unlawful extension of the traffic stop for the purpose of conducting a drug investigation. The trial court denied that motion, stating in a brief letter opinion that the officers "developed sufficient reasonable suspicion probable cause [*sic*] in the course of the routine traffic stop and investigation of defendant's vehicle to search." Defendant was subsequently convicted of one count of unlawful delivery of heroin, ORS 475.850, and one count of delivery of heroin within 1,000 feet of a school, ORS 475.882. This timely appeal followed.

Defendant assigns error to the denial of the motion to suppress. He concedes that the traffic stop was lawful at its inception, but contends that, under Article I, section 9, of the Oregon Constitution, the officers unlawfully extended the traffic stop when they started to conduct a drug investigation and that suppression of the evidence obtained as a result of that extension was required under *Rodgers/ Kirkeby*. Defendant asserts that Gould's questioning about matters unrelated to the traffic stop and the officers' call for and deployment of a drug-detection dog prolonged the stop beyond the time reasonably necessary to investigate and process the vehicular infractions. He further contends that those actions were not supported by a reasonable suspicion of criminal activity. The state responds that none of the officers' actions actually prolonged the stop beyond what was reasonably necessary to deal with the vehicular infractions and that, in all events, any extension of the stop was justified because it was based on a reasonable suspicion of defendant's involvement in criminal activity.

Article I, section 9, establishes the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." A "stop" is a type of seizure; it is "a temporary restraint of a person's liberty for the purpose of criminal investigation" and must be justified by a "reasonable suspicion of criminal activity." *Rodgers/Kirkeby*, 347 Or at 621. "Police can conduct a stop for violation of a traffic offense if they have probable cause to believe that the offense has occurred and that belief is reasonable." *State v. Hall*, 238 Or App 75, 78-79, 241 P3d 757 (2010), *rev den*, 349 Or 664 (2011).

> "Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation."

*Rodgers/Kirkeby*, 347 Or at 623 (emphasis in original).

We begin with defendant's contention that certain questions that Gould asked defendant were unrelated to the valid purposes of the stop. *See State v. Farrar*, 252 Or App 256, 260, 287 P3d 1124 (2012) ("An officer unlawfully extends the scope of an otherwise lawful stop if the officer questions the person about matters unrelated to the basis for the traffic stop without reasonable suspicion of criminal activity.").

Specifically, defendant identifies Gould's questions about defendant's needle marks, about where defendant was going, and about whom defendant was going to meet as those that prolonged the stop. We understand defendant to contend that those questions both prolonged the stop and were not reasonably related to—what he concedes were—the legitimate justifications for the stop, *viz.*, addressing the vehicular infractions.[3]

---

[3] Gould stated that the reason he inquired about where defendant was going and whom he was meeting was to investigate drug crimes.

The state quotes *State v. Dennis*, 250 Or App 732, 737, 282 P3d 955 (2012), for the proposition that "there are no Article I, section 9, implications if an inquiry unrelated to the traffic stop occurs during a routine stop but does not delay it." *See Hall*, 238 Or App at 83 (questions posed by an officer that are unrelated to the purposes of the traffic stop but that occur during an "unavoidable lull" in the course of the stop do not implicate Article I, section 9). The state thus contends that defendant did not show that the "questions asked of him in this case resulted in any increase in the length of his detention." We need not decide whether that is the case, for we conclude that, even with any prolongation of the stop, that questioning was justified by a reasonable suspicion of criminal activity.

> "A stop of a person by a police officer is supported by reasonable suspicion when the officer subjectively believes that the person has committed or is about to commit a crime and that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop. To be objectively reasonable, the officer's suspicion must be based on specific and articulable facts. A police officer's training and experience are relevant considerations that bear on the reasonable factual inferences that an officer may draw."

*State v. Maciel*, 254 Or App 530, 535, 295 P3d 145 (2013) (citations omitted).[4]

These are the facts known to Gould at the time he began questioning defendant: defendant had made a sudden left turn and then drove very slowly through a parking lot, passing several open parking spaces after Gould signaled him to stop; he had "very recent" needle marks on his arm that were inconsistent with his explanation that he had used drugs approximately one year earlier; defendant was acting

---

[4] In *Rodgers/Kirkeby*, the Supreme Court noted that "verbal inquiries are not searches and seizures. * * * However, police conduct that involves physical restraint or a show of authority that restricts an individual's freedom of movement typically does implicate Article I, section 9." 347 Or at 627. There is no suggestion that defendant ever ceased to be "seized" throughout the course of the encounter. *See State v. Ehret (A111248)*, 184 Or App 1, 8, 55 P3d 512 (2002) ("This case is not like those cases in which a conversation occurred between a citizen and a police officer after a traffic stop has ended.").

very nervous and his hands were shaking; he was speaking very slowly in a monotone voice; there was a "noticeable delay" in his answers to Gould's questions; and his pupils were overly constricted, given the level of daylight. Based on those facts, Gould, a trained member of the Salem Police Department Drug Activity Response Team, testified that he believed that defendant was "likely under the influence of, for example, a narcotic analgesic." Defendant points to *State v. Frias*, 229 Or App 60, 210 P3d 914 (2009), *State v. Holcomb*, 202 Or App 73, 121 P3d 13, *modified on recons*, 203 Or App 35, 125 P3d 22 (2005), and *State v. Ehret (A111248)*, 184 Or App 1, 9, 55 P3d 512 (2002), for the proposition that an officer's knowledge that a suspect has been involved with drugs at some point in the past does not support a reasonable suspicion of criminal activity. That may be true as a general rule, but those cases are easily distinguishable for the reason that, here, there are ample facts from which Gould could reasonably conclude, in light of his experience and training, that defendant was under the influence of a controlled substance—*viz.*, an intoxicant—*while driving a car. See* ORS 813.010(1); *cf. Frias*, 229 Or App at 65 (there was "no evidence" of driving under the influence of intoxicants); *Holcomb*, 202 Or App at 75 (the officer "concluded that [the defendant] was not under the influence of a controlled substance"); *Ehret*, 184 Or App at 10 ("Nothing in the record would permit the inference that [the officer] subjectively believed that defendant had been driving while under the influence."). In light of the facts known to him, Gould's suspicion that defendant was under the influence of an intoxicant was objectively reasonable; therefore, he was justified in commencing an investigation into defendant's recent *use* of a controlled substance.[5]

That leaves defendant's contention that the officers unlawfully extended the stop by sending for a drug-detection dog and allowing the dog to sniff the car. On that point, defendant contends that, even if Gould had a reasonable suspicion that he was under the influence of narcotics,

[5] Defendant's only contention regarding Gould's questioning is that Gould did not have a reasonable suspicion to think that defendant had engaged in criminal activity; there is no argument from defendant that the questions asked by Gould were not sufficiently tailored to the scope of his suspicions.

Gould's belief that there were *narcotics in the vehicle* was not reasonable. That is, argues defendant, Gould's belief that defendant was presently under the influence of an intoxicant could not justify the extension of the stop for the purpose of deploying a drug-detection dog.

The state attempts to forestall the need to examine the reasonableness of the officers' suspicions about the presence of drugs in the car by arguing that the call for and deployment of the dog did not, in any event, prolong the stop, and thus required no additional justification. We agree with the state that the act of calling for the drug dog did not prolong the stop. In accordance with our standard of review, 267 Or App at 383, the record shows that Gould was in the process of writing his citations at the time that Horn sent for the dog. It also reveals that Gould was working on the citations during the time that it took for Miller and his dog to reach the scene. The state's contention that the *deployment* of the drug dog did not prolong the stop, however, finds no evidentiary support. To the contrary, Gould testified that, during the dog sniff, he "was standing and watching—watching the dog because both—both [defendant] and Foster were still in the vehicle at that point." Gould testified that he then removed defendant from the car at the request of Miller and for the purpose of facilitating the dog's work. Although Gould could not remember whether he had completed the citations by that time, he stated that he had not yet given any of them to defendant. It is not possible to conclude from that testimony other than that the deployment of the dog prolonged the stop; Gould could have been completing whatever work remained to process the vehicular infractions at a time that he was instead facilitating the dog sniff.[6]

---

[6] The state argues that, because defendant's license was suspended, he would have been asked to step out of the car in any event, and that the act of removing him from the car did not add to the length of the stop. We fail to see how that is the case. Certainly, defendant would not be permitted to drive away from the scene, but we do not understand why that leads to the conclusion that defendant would have been removed from the car, patted down, and detained for the time that the dog took to sniff his car twice. The state also argues that there were, at the time of the dog sniff, lots of "loose ends that had to be tied up" by the officers that had to do with the vehicular infractions before the stop could end. To that, we can only say that, in the absence of reasonable suspicion to support the deployment of the drug dog, the officers should have been tying them up.

The question then becomes whether the deployment of the drug-detection dog was supported by a reasonable suspicion that there were drugs present in the vehicle. As our framing of that question implies, we agree with defendant that, unlike Gould's questioning of defendant, the act of deploying the dog cannot be supported as "reasonably related" to Gould's suspicion of DUII. The gravamen of that crime, of course, is driving under the influence of an intoxicant. However, "an officer's reasonable suspicion about certain crimes *does not justify* the officer's extension of a stop to conduct an investigation of another crime for which the officer does not also have reasonable suspicion." *State v. Kentopp*, 251 Or App 527, 534, 284 P3d 564 (2012) (emphasis in original). In other words, Article I, section 9, requires "that law enforcement officers have a justification for temporarily seizing or stopping a person to conduct an investigation, and that the officer's activities be reasonably related to that investigation and reasonably necessary to effectuate it." *State v. Watson*, 353 Or 768, 781, 305 P3d 94 (2013); *see Maciel*, 254 Or App at 537 (officer's reasonable suspicion that the car in which defendant was a passenger was stolen did not support extension of stop to initiate drug-trafficking investigation). A drug-detection dog detects the presence of drugs, not whether a person is intoxicated. It is for that reason that the relevant question is whether Gould's stated belief that there were drugs in the car—*e.g.*, the circumstance that would support the deployment of a drug-detection dog—was objectively reasonable. *But see State v. Nevel*, 126 Or App 270, 275, 888 P2d 1338 (1994) ("[The officer's] inquiry of defendant concerning the possibility of methamphetamine in his van was not unrelated to [the crime of DUII] and thus was within the permissible scope of questioning under ORS 131.615(3).").

Having staked its arguments largely on the premise that the stop was not prolonged, the state does not exert any significant effort to argue that the deployment of the drug dog was supported by a reasonable suspicion that defendant *presently possessed a controlled substance*. Instead, it merely offers the conclusory statement that any extension of the stop was "justified by reasonable suspicion that drugs or drug paraphernalia would be found in the vehicle" under

the circumstances.[7] We have had frequent occasion to consider whether an officer's reasonable suspicion that a person is under the influence of a drug is sufficient on its own to provide an objectively reasonable basis for concluding that the person presently possesses drugs; we have consistently conclude that it does not. *See Kentopp*, 251 Or App at 532 ("[A]n officer's observation of signs of a person's past drug use does not, by itself, give rise to reasonable suspicion that the person currently possesses drugs."); *State v. Morton*, 151 Or App 734, 739, 951 P2d 179 (1997), *rev den*, 327 Or 521 (1998) (officer did not have a reasonable suspicion that a defendant passenger possessed marijuana, despite the officer's observations that the defendant's appearance and behavior were consistent with being under the influence of that drug); *Farrar*, 252 Or App at 261 ("[E]vidence of methamphetamine use, without more, does not give rise to reasonable suspicion that defendant presently possesses more methamphetamine."); *accord State v. Lavender*, 93 Or App 361, 762 P2d 1027 (1988) (officer's belief that the defendant was under the influence of a controlled substance at the time of her arrest was insufficient to support probable cause to believe that she possessed drugs, even when she was being arrested on a warrant for controlled-substance possession and had attempted to hide the contents of her purse from the view of the arresting officers). *But see State v. Blount*, 143 Or App 582, 589, 924 P2d 860, *rev den*, 324 Or 488 (1996) (officer's observation that the defendant appeared to be on methamphetamine, when combined with the defendant's location in an area known for drug activity and a lack of evidence that "someone other than [the] defendant had introduced the methamphetamine into [the] defendant's body," established probable cause for the officer to think that the defendant had "possessed methamphetamine before introducing it into his body").

Thus, something more is required than an officer's reasonable belief that a suspect is under the influence of a

---

[7] The state does not separately argue that the dog sniff was justified as part of an investigation that was reasonably related to the crime of DUII. *See generally Watson*, 353 Or at 781 (noting that when officers temporarily seize or stop a person for purposes of conducting an investigation, the officers' activities must "be reasonably related to that investigation and reasonably necessary to effectuate it"). Accordingly, we express no opinion on that point.

controlled substance to render a suspicion of present possession objectively reasonable.[8] At the suppression hearing, the state asked Gould about the basis for his belief that there were controlled substances in the car.

"[STATE]: So based on your training and experience, did you—do you have an experience in the area of if someone has used recently, whether or not they would possibly have any kind of controlled substances on their person, or within their vehicle?

"[GOULD]: Yes.

"[STATE]: And what can you [tell] the Court about that?

"[GOULD]: It's—it's my experience, even if somebody doesn't have the actual substance with them, they'll oftentimes carry a—I'd say a drug kit. They'll carry that, say, in an eyeglass container with their syringes that they can use, a lighting source, a spoon, for, in this case, heroin, that they'll—they'll use a spoon. So different—at least paraphernalia, and then also likely substance that they keep with them. I know that specifically heroin users oftentimes, if they have a strong addiction, will have to use regularly, so in—in order not to get sick, so in that case, they oftentimes keep those things with them closely."

Defense counsel asked Horn about the basis for his belief that there were drugs in the car:

"[DEFENSE COUNSEL]: So *** you indicated that you had reasonable suspicion that there w[ere] narcotics in the vehicle?

"[HORN]: Correct.

"[DEFENSE COUNSEL]: And that was based on your knowledge of the driver from the—what turned out to be the prior investigation?

---

[8] That is, of course, a distinct question from whether present intoxication can support an objectively reasonable suspicion that a suspect previously possessed drugs, *i.e.*, immediately before consuming them. The reasonableness of *that* inference, however, is not at issue here: a drug dog detects the presence of drugs, not prior drug consumption. *See State v. Kolb*, 251 Or App 303, 310-11, 283 P3d 423 (2012) (explaining the distinction and declining to consider state's "'recent past possession' theory of reasonable suspicion" where the state failed to preserve that argument); *see also Watson*, 353 Or at 781 ("[T]he officer's activities [must] be reasonably related to that investigation and reasonably necessary to effectuate it.").

"[HORN]:   The passenger.

"[DEFENSE COUNSEL]: I'm sorry. The passenger.

"[HORN]:   Correct.

"[DEFENSE COUNSEL]:   Your observations about—observations of the physical appearance of the passenger, and the shuffling [of] the feet, and putting his hand under his thigh?

"[HORN]:   Correct.

"[DEFENSE COUNSEL]:   Anything else?

"[HORN]:   Not that I can think of."

In concluding that there was not an objectively reasonable suspicion that there were drugs in the car, we begin by noting that Gould, the only officer to speak with defendant, did not articulate *any* facts—aside from defendant's intoxication—in explaining why he believed that there were drugs in the car. That is, despite that his "training and experience" taught him that heroin users often carry "drug kits" about them—*i.e.*, the very inference that, standing alone, we have repeatedly declared insufficient—Gould never identified anything that could serve as the "something more" that our cases demand.[9]

That leaves Horn's knowledge of Foster's prior involvement in drug activity and observations about Foster's movements, the "shuffling of his feet" around the coat, and his "putting his hand under his thigh" repeatedly. As an initial matter, Horn's testimony about the coat was so vague and equivocal that it is impossible to ascribe it any

---

[9] The state does not specifically suggest that Gould's belief that there was a "drug kit" in the car—that is, syringes, a spoon, and a "lighting source"—supported the extension of the stop for the purposes of deploying a drug dog. Even if we did discern such an argument, we would, on this record, reject it for the reasons stated in *Kolb*, 251 Or App at 314-15 ("[T]here is absolutely no basis in this record from which one can infer, without resorting to speculation, that [the fact that drug paraphernalia may bear traces of prior use] applies specifically to methamphetamine use, yielding an objectively reasonable prospect that implements of recent use will bear or contain detectable traces of the controlled substance. *That* 'bridge' was never 'built.'" (Emphasis in original.)). To the reasoning in *Kolb*, we might add that, in this case, there was no evidence presented that the dog could detect the residue left on used drug implements; the only evidence was that the dog was trained to detect the "odors" of marijuana, heroin, cocaine, and methamphetamine.

significance in our analysis.[10] As to the movements around his thigh, neither officer testified at any point that he had observed any contraband or object associated with drug use, nor any containers that might indicate, for one reason or another, that they contained illicit items. The implication, of course, was that Foster might have had something under his thigh that he wanted concealed from police view, but in no way was that suspicion of Horn's verified through direct observation.

Even more problematic is that that testimony reveals that Horn's suspicions were entirely centered on Foster. However, "[t]he officer's suspicion must be 'particularized to the individual based on the individual's own conduct.'" *Farrar*, 252 Or App at 260 (quoting *State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004)). That is, even assuming that it was objectively reasonable to think that Foster, based on his intoxication, his peculiar movements, and his prior involvement with drugs, had concealed drugs under his leg or in the coat at his feet, the state has not explained how that suspicion justified prolonging the stop of *defendant* on the basis of a reasonable suspicion that *defendant* presently possessed drugs. It is that stop, however, that is at issue in this appeal. The indicators of criminal activity that were articulated by the officers, other than defendant's intoxication, were entirely centered on Foster, but there is no indication, on this record, that prolonging the detention of defendant was necessary to investigate Foster based on a reasonable suspicion that Foster was carrying drugs.

---

[10] Horn testified:

"Well, there was a coat—down there was a coat on the floorboard, and it was like he was—I mean, normal people when they sit there, and there's stuff on the floorboard, they just kind of—their feet are already in the position that they're—they're not on something. They're already—they're already there because they've been in the car for sometime. Well, he kept moving this coat around with his foot with—with his feet, and kept—like he was—his feet were overly concerned with—or he was overly concerned of where he was going to be placing his feet on this coat. Like if there was something under the coat like—he didn't want to step on and break, or—or there was something inside the coat that he didn't want to break, or even maybe it was—or if I didn't—if I wasn't able to see—I mean, I saw the coat, and it looked just like—kind of like a—just a dirty coat, but it's almost like it would have been a clean, brand new coat that he didn't want to put his feet on it."

Consider the Supreme Court's recent decision in *State v. Holdorf*, 355 Or 812, 333 P3d 982 (2014). There, a defendant was a passenger in a car being driven by a "known felon with an outstanding warrant who was under investigation as a suspect in a local methamphetamine distribution ring." *Id.* at 829. After a police officer lawfully stopped the car for a traffic infraction, the officer saw that the defendant was "tweaking," that is, under the influence of methamphetamine. *Id.* at 815. The defendant asked if he was free to leave; the officer told him that he was not. The officer then asked the defendant if there were any weapons in the vehicle; the defendant responded that there was a knife between the seat and the door. The officer opened the door and saw a knife. The defendant stepped out of the vehicle. The officer patted him down, finding a knife and metal containers inside the defendant's pockets. Marijuana and methamphetamine "were subsequently found inside the containers." *Id.* at 816.

The court addressed "whether the officer's observation that [the] defendant appeared to be under the influence of methamphetamine, based on the officer's training and experience, was sufficient to establish 'reasonable suspicion' that [the] defendant had committed the crime of possession of methamphetamine when considered under the totality of the circumstances." *Id.* at 814. The court concluded that the officer's observation that the defendant was "tweaking," when coupled with the knowledge that the driver was a "known felon with an outstanding warrant who was under investigation as a suspect in a local methamphetamine distribution ring," was sufficient to "g[i]ve rise to a reasonable inference that the defendant committed the crime of possession of methamphetamine." *Id.* at 829.

*Holdorf* only addressed whether there was reasonable suspicion to conduct a stop in the first place, *i.e.*, whether it was objectively reasonable to conclude that the defendant "has committed a crime or is about to commit a crime." 355 Or at 823. Whether it was reasonable to conclude that the defendant presently possessed drugs—the relevant issue in this case—is a point on which *Holdorf* had nothing to say. *See Watson*, 353 Or at 781 ("[B]oth Oregon statutes and [the

Supreme] [C]ourt's Article I, section 9, case law require that law enforcement officers have a justification for temporarily seizing or stopping a person to conduct an investigation, *and* that the officer's activities be reasonably related to that investigation and reasonably necessary to effectuate it." (Emphasis added.)). In other words, even if we assume that it was reasonable to think that defendant had possessed drugs before consuming them, that only takes the state as far as it got in *Holdorf*: that it was lawful to stop the defendant. The question here though is whether the deployment of the drug-detection dog was supported—as we conclude it was required to be—by an objectively reasonable suspicion that defendant was *presently* in possession of drugs. On this record, there were insufficient facts to render it objectively reasonable to conclude that defendant—presently—possessed drugs; we conclude that the extension of the stop was unlawful.

Our remaining task is to determine whether that conclusion requires that the evidence should have been suppressed. *See State v. Davis*, 313 Or 246, 249, 834 P2d 1008 (1992) (Oregon's constitutional protection against unreasonable searches and seizures includes the right to be free from the use, in a criminal prosecution, of evidence obtained in violation of defendant's rights under Article I, section 9). Whenever the state has obtained evidence following the violation of a defendant's Article I, section 9, rights, it is presumed that the evidence was tainted by the violation and must be suppressed. *See State v. Unger*, 356 Or 59, 84, 333 P3d 1009 (2014). The state may rebut that presumption by establishing that the disputed evidence "did not derive from the preceding illegality." *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). One of the ways that the state may do so is by "showing that the observance of lawful procedures inevitably would have brought the evidence to light." *Id.* at 44.

In what is perhaps a misstatement of the applicable burden, the state argues that "there is no basis for concluding that the evidence defendant sought to suppress would not have been discovered but for his extended detention." For that proposition, the state argues that defendant would not have been allowed to drive his car away for either of two reasons: (1) he was already under arrest for the crime of

failing to present a valid license at the time of the dog sniff, and (2) defendant was not, in any event, licensed to drive. Thus, urges the state, the car would have remained parked where it was after the stop of defendant was over, Miller and his dog would have arrived, and the evidence would have, inevitably, been discovered.

The argument that defendant was already under arrest for failing to present a valid license is not supported by the record. Gould testified that he arrested defendant for a "misdemeanor crime" immediately after the dog alerted to the car. Although Gould never stated the precise basis for that arrest, it defies all reason to suggest that Gould spent more than 18 minutes, in part, engaged in preparing a citation to issue defendant for his failure to carry a license and then, immediately after a drug dog sniffed his car, in the middle of a drug investigation involving three officers, and in apparent contravention of his department's policy, suddenly decided to arrest him for the license offense.[11] In other words, the record admits of no doubt that the arrest occurred *because* of the dog sniff.

That leaves the state's second hypothetical that, even if the stop had not ended in his arrest, the car would have remained parked lawfully where it was because defendant was not privileged to drive. The difficulty with that argument is that it assumes that defendant would have— after he was no longer stopped and thus free to carry on his way—left his possessions in the car. There is neither a basis in the record for that assumption, nor is there an argument from the state that the officers would have been entitled to seize or search either the coat or the black pouch in the event that defendant had attempted to leave with them before the dog alerted to the car.[12] The state has failed to establish that the evidence obtained after the dog sniff would inevitably have been discovered.

---

[11] Gould testified that Salem police policy calls for citing and releasing a driver who fails to carry or present a license, unless the officer cannot verify the identification of the driver, in which case the driver is detained until his or her identity can be established. Gould testified that he had already verified defendant's identity—presumably with the computer in his cruiser—by the time that Miller and his dog arrived.

[12] In fact, in contending that the dog sniff did not prolong the stop, the state's brief argues that "[d]efendant still had to exit the car and retrieve his belongings so that the car could be secured" as a prerequisite to concluding the stop.

In sum, based on defendant's concession that the traffic stop was lawful at its inception, we conclude that the trial court did not err in denying defendant's motion with respect to the evidence that was obtained from the beginning of the stop to the point at which the officers deployed the drug dog. However, because the deployment of the drug dog prolonged the stop and was not supported by an objectively reasonable suspicion that drugs would be found in the vehicle, we conclude that the trial court erred in denying defendant's motion to suppress that evidence obtained after the drug dog was deployed. Consequently, we reverse and remand.

Reversed and remanded.